IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| BENJAMIN HACKER,<br>on behalf of Plaintiff and the class<br>members described herein,<br><br>        Plaintiff,<br><br>        v.<br><br>MINTO DEVELOPMENT<br>CORPORATION;<br>BENHTI ECONOMIC<br>DEVELOPMENT CORPORATION;<br>DOUGLAS WILLIAM ISAACSON; and<br>MINTO FINANCIAL d/b/a Minto Money,<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   DEMAND FOR TRIAL BY JURY<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT – CLASS ACTION

### INTRODUCTION

1. Plaintiff, Benjamin Hacker, brings this action to secure redress against the making of usurious loans (such as Exhibit A) to Plaintiff and other Indiana residents by Defendants Minto Development Corporation ("MDC"), Benhti Economic Development Corporation ("Bedco"), Douglas William Isaacson ("Isaacson"), and Minto Financial d/b/a Minto Money ("Minto Money").

2. Plaintiff seeks damages under the Indiana Consumer Credit Code (Count I) and RICO (Count II).

### JURISDICTION AND VENUE

3. The Court has subject matter jurisdiction under 28 U.S.C. § 1331, 18 U.S.C. § 1964, 28 U.S.C. § 1337, and 28 U.S.C. § 1367. Jurisdiction may also exist under 28 U.S.C. § 1332(d), in that the amount in controversy on a classwide basis exceeds $5 million, exclusive of interest and costs, and in that there are believed to be over 100 members of the class, all of whom are of diverse citizenship to Defendants.

4. This Court has personal jurisdiction over each Defendant because they knowingly

participated in the making of unlawful loans to Indiana residents.

5.   Venue is proper because acts to collect the loans impacted Plaintiffs in the Southern District of Indiana.

6.   As set forth below, Defendants operate interactive websites through which they sought to and did make loans to Indiana residents. The use of an interactive website which permits Indiana residents (but not residents of specified other states) to apply for loans, along with the making and collecting of loans within the state, establishes a purposeful availment of Indiana and is sufficient to establish personal jurisdiction over the defendants responsible for the site. *Toys "R" Us, Inc., v. Step Two*, 318 F.3d 446, 454 (3rd Cir. 2003).

## PARTIES

7.   Plaintiff Benjamin Hacker is a natural person residing in Indianapolis, Indiana.

8.   Defendant Bedco is an economic development corporation purportedly organized under the laws of the Native Village of Minto, and uses the address of 205 Lakeview Dr., Suite 7, Minto, AK 99758.

9.   MDC is an Alaska corporation with a registered mailing address of 615 Bidwill Ave., Suite 303, Fairbanks, AK 99701.

10.  MDC's Alaska registered agent is Roxanne Frank, 938 Dennis Rd., North Pole, AK 99705.

11.  MDC claims to be the owner of online payday lending website Minto Money, which operates from www.mintomoney.com.

12.  Minto Money makes loans to consumers, including consumers in Indiana, at interest rates in excess of 600% annually.

13.  Defendant Douglas William Isaacson ("Isaacson") is the Chief Executive Officer of MDC and maintains an office at 615 Bidwill Ave., Suite 303, Fairbanks, AK 99701.

14.  According to Isaacson's online resume on LinkedIn, his job as CEO entails overseeing engagement in "innovative growth sectors" which include "lending." (Exhibit B)

15. According to Defendants Bedco, MDC and Isaacson, Minto Financial d/b/a Minto Money is a legal entity existing under the laws of the Native Village of Minto. Plaintiff therefore name it as a Defendant.

## FACTS

16. On May 4, 2022, Plaintiff Benjamin Hacker obtained a loan from "Minto Financial d/b/a Minto Money" at over 750% interest. (Exhibit A)

17. "Minto Money" regularly advertises and makes loans to Indiana residents at such rates.

18. The loan agreement (Exhibit A) is a standard form.

19. The loan was made via the Internet to Plaintiff while Plaintiff was located in Indiana, where he resided.

20. The principal amount was transferred to Plaintiff's bank account in Indiana via ACH.

21. The loans were to be repaid via ACH transfers from Plaintiff's bank account in Indiana.

22. Plaintiff has never set foot on the Tribe's land.

23. Plaintiff made payments on the loan, including interest.

24. The loan was obtained for personal, family or household purposes and not for business purposes.

25. "Minto Money" sought out Indiana residents for such loans.

26. Defendants contend and represent that the "Minto Money" loans are valid and enforceable loans ("Minto Money" FAQs, Exhibit C).

27. A significant majority of the transaction occurs within the State of Indiana – applying for the loan and receiving and collecting the funds.

28. The place where a consumer is located when he or she submits an application via an online portal with a Native American tribe determines where the transaction takes place for

3

jurisdictional purposes. *California v. Iipay Nation of Santa Ysabel,* 898 F.3d 960, 968 (9th Cir. 2018) ("However, the patrons' act of placing a bet or wager on a game of DRB while located in California constitutes gaming activity that is not located on Indian lands, violates the UIGEA, and is not protected by IGRA.").

29. Loans to Indiana residents made in the same manner as the loan to Plaintiffs are governed by the laws of the State of Indiana.

## DEFENDANTS' LENDING ACTIVITIES

30. The website of Minto Money states: "Minto Financial dba Minto Money is a wholly owned subsidiary of Benhti Economic Development Corporation ("Bedco"), a sovereign economic arm, enterprise and instrumentality of, and created under the laws of and for the benefit of, the Native Village of Minto, a federally recognized sovereign American Indian tribe in Alaska."

31. The Native Village of Minto (the "Minto Tribe") is a small, isolated, financially strapped American Indian tribe located about seventy-five miles northwest of Fairbanks, Alaska. It has approximately 223 enrolled members.

32. Minto Financial and Bedco, in turn, operate under a "tribal lending license" signed by Shane Thin Elk ("Thin Elk"), the "commissioner" of the Minto Financial Services Licensing & Regulatory Commission. (Exhibit D)

33. On information and belief, the "commission" has issued only one license in its existence: the one granted to operate Minto Money.

34. The Minto Financial Services Licensing & Regulatory Commission was created immediately before issuing this single license.

35. The "commission" places no restrictions on interest rates charged to consumers, unlike Alaska state law which limits payday loans to $500 and caps fees at $75 for such a loan.

36. Thin Elk is an attorney who previously lived in Omaha, Nebraska, and formerly practiced law with Fredericks Peebles & Morgan LLP, a law firm with a significant practice devoted to, per its website, "PROTECTING Tribal Sovereignty." He is now the owner of Thin Elk Law in

Green Bay, Wisconsin, where he lives.

37. On information and belief, Thin Elk is not a member of the Minto Tribe; rather, he is an enrolled member of a different Native American tribe located thousands of miles from Alaska.

38. Minto Money is not beneficially owned or operated by the Minto Tribe, but rather, it operates primarily for the benefit of non-tribal members like Isaacson.

39. Thus, Minto Money is a "rent-a-tribe" scheme, described below.

40. The main function of Minto Money is to appear, on paper at least, to control the lending operation so that Isaacson and his investors may use the specter of sovereign immunity as a way to ward off the consumers they victimize, as well as state and federal regulatory authorities.

### Minto Money Claims to be 'Trusted' Lender

41. Defendants, doing business as "Minto Money," deceptively market loans to consumers, referring to the loans as "installment loans" and heavily emphasizing that they are not "payday loans," attempting to avoid the negative connotation associated with such high-interest loans. For example, the website of Minto Money claims "we are a trusted loan lender who wants to help customers in need with any unexpected expenses. We are a quick loan service that practices excellent customer service. Our installment loans are better than payday loans because you can pay down the principal amount with each payment." (Exhibit E)

42. Despite such assurances, Minto Money lends money at annual interest rates that exceed 700%.

### Isaacson Runs Minto Money for His Own Benefit, Not the Tribe's

43. The primary beneficiary of the Minto Money rent-a-tribe scheme is Isaacson, a past president of Credit Services, Inc., which was an affiliate of Trans Union LLC.

44. Isaacson was born in 1957 in Seattle, Washington, and is not a member of the Minto Tribe.

45. Isaacson currently lives in North Pole, Alaska, about 12 miles south of Fairbanks.

Isaacson formerly served as mayor of North Pole.

46. Isaacson, via one or more entities controlled by him, acts as an agent or "authorized service provider" for Minto Money and obtains credit reports regarding consumers, purportedly for the exclusive end-use by Minto Money. Isaacson then contracts with outside, non-tribal members who perform underwriting analytics, customer service, collection duties, and all other related business functions.

47. Bedco, the purported parent company of MDC, is also controlled by Isaacson. Isaacson claims on his LinkedIn profile to be the CEO of MDC.

48. Domain Name Registration records show that Bedco's only website, www.bedco.us, is registered to Isaacson. (Exhibit F)

49. When aggrieved consumers complain about Minto Money to organizations such as the Better Business Bureau ("BBB"), Isaacson responds personally to the complaints, calling himself the "General Manager" of Minto Financial. (Exhibit G)

50. The Minto Tribe receives a 2% "fee" or "commission" on loan revenues.

51. The website www.mintomoney.com is held via a proxy to conceal the persons behind it (Exhibit H).

**How Minto Money Underwriting is Performed**

52. Defendants obtain data on consumers from credit bureau reports ("CBRs") provided by consumer reporting agencies ("CRAs").

53. Once obtained, data in the CBRs is analyzed by software produced by outside, non-tribal vendors. The vendors' sophisticated algorithms crunch the CRAs' data and assign a proprietary risk score to the applicant.

54. Isaacson and his non-tribal investors unilaterally determine the minimum qualifying score for a loan approval, the interest rate, repayment terms, and all other meaningful aspects of the loan.

55. The Minto Tribe has no say in these matters.

56. If a consumer is approved and elects to take out a loan, then completed loan documents and details are transmitted to a Minto Tribe representative who may be physically located in Minto. The representative then electronically "reviews" the documents and provides "final approval" to the loan while, supposedly, on the Minto Tribe's soil.

57. After the pro forma review by the Minto Tribe, the loan is funded with money under the express and direct control of Isaacson and his non-tribal investors. The Minto Tribe itself has no access to the bank accounts containing the working capital used to fund Minto Money loans. Isaacson then pays roughly 2% of the loan revenues to MDC, which, conveniently, he also controls.

58. While MDC then uses these funds for tribal projects and provides assistance to tribal members, 98% of revenues are kept by Isaacson and his investors.

59. However, because of the rubber-stamp approval occurring in Minto, Isaacson, Bedco, MDC and the Minto Tribe claim the Minto Money loans are made on the Minto Tribe reservation and subject exclusively to Minto tribal law.

60. The purported address of Minto Money, is 205 Lakeview Dr., Ste 7, Minto, AK 99758. It also uses PO Box 58112, Minto, AK 99758.

61. The Lakeview Drive address is a building on tribal lands, albeit a building with no individual suites or suite numbers.

62. The address is a building used for school and senior lunch programs, community meetings, and village council operations. No call center, data center, or offices relating to any lending enterprise are found at this address. Indeed, the idea that any company relying on e-commerce to facilitate large numbers of transactions at 205 Lakeview Drive in Minto is dubious, at best, since the area lacks any high-speed internet service providers. DSL service is available, albeit at speeds of only 2 megabits per second.

63. Despite the suite number of 7, no other suite numbers exist and the building does not contain offices divided into suites.

64. Isaacson, Bedco, and MDC, doing business as Minto Money, frequently lend money

consumers in Indiana, transfer money to the accounts of Indiana consumers via banks located in Indiana, and then electronically debit those same Indiana accounts.

65. At all times relevant, Isaacson, Bedco, and MDC, doing business as Minto Money, operated an interactive website that was frequently accessed by consumers in Indiana relating to their high interest loans.

66. The website stated that loans would not be made to persons in certain states. Indiana was not one of those states.

67. The list of states in which loans would not be made reflects states where Defendants were concerned that they would be prosecuted by local authorities.

68. Defendants were aware that their loans were illegal in the listed states and others.

69. Operation of an interactive website like MintoMoney.com is a factor which tends to establish personal jurisdiction over a defendant in the forum state, *Toys "R" Us, Inc., v. Step Two*, 318 F.3d 446, 454 (3rd Cir. 2003), particularly when it invites transactions from persons in other states including Indiana.

## INDIANA REGULATION OF LENDING

70. The Indiana Uniform Consumer Credit Code establishes a maximum loan finance charge of 36% per annum for consumer loans.

71. Ind. Code § 24-4.5-3-201, dealing with loans other than supervised loans, provides:

> (1) Except as provided in subsections (7) and (9), with respect to a consumer loan, other than a supervised loan (as defined in section 501 [IC 24-4.5-3-501] of this chapter), a lender may contract for a loan finance charge, calculated according to the actuarial method, not exceeding twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter). . . .

72. With respect to supervised loans, the Indiana Uniform Consumer Credit Code, Ind. Code § 24-4.5-3-508, provides:

> Loan finance charge for supervised loans.
>
> (1) With respect to a supervised loan, including a loan pursuant to a revolving loan account, a supervised lender may contract for and receive a loan finance charge not exceeding that permitted by this section.

8

(2) The loan finance charge, calculated according to the actuarial method, may not exceed the equivalent of the greater of:

    (a) the total of:

        (i) thirty-six percent (36%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) [IC 24-4.5-3-107(3)] of this chapter) which is two thousand dollars ($2,000) or less;

        (ii) twenty-one percent (21%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than two thousand dollars ($2,000) but does not exceed four thousand dollars ($4,000); and

        (iii) fifteen percent (15%) per year on that part of the unpaid balances of the principal (as defined in section 107(3) of this chapter) which is more than four thousand dollars ($4,000); or

    (b) twenty-five percent (25%) per year on the unpaid balances of the principal (as defined in section 107(3) of this chapter). . . .

73. There is also a provision for small loans, Ind. Code § 24-4.5-7-101 et seq., but it does not authorize Defendants' rates, and requires that small loans conform to other requirements that Defendants' loans do not comply with.

74. The amount of finance charge provided for in <u>Exhibit A</u> greatly exceeds that permitted in Indiana on either unsupervised or supervised loans.

75. Ind. Code § 24-4.5-1-201, "Territorial application," provides:

(1) Except as otherwise provided in this section, this article applies to sales, leases, and loans made in this state and to modifications, including refinancings, consolidations, and deferrals, made in this state, of sales, leases, and loans, wherever made. For purposes of this article, the following apply: . . .

    (c) A loan or modification of a loan agreement is made in this state if a writing signed by the debtor and evidencing the debt is received by the lender or a person acting on behalf of the lender in this state.

    (d) Except as provided in subdivisions (e) and (f), a sale, lease, or loan transaction occurs in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction with a creditor or a person acting on behalf of the creditor in another state and the creditor or the person acting on behalf of the creditor has advertised or solicited sales, leases, or loans in Indiana by any means, including by mail, brochure, telephone, print, radio, television, the Internet, or electronic means.

    (e) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a

> resident of Indiana enters into a consumer sale, lease, or loan transaction secured by an interest in land located outside Indiana.
>
> (f) A sale, lease, or loan transaction does not occur in Indiana if a consumer who is a resident of Indiana enters into a consumer sale, lease, or loan transaction at a creditor's place of business in another state.

For purposes of subdivisions (a) through (c), an offer is received by a creditor or a person acting on behalf of the creditor in Indiana if the offer is physically delivered, or otherwise transmitted or communicated, to a person who has actual or apparent authority to act for the creditor or the person acting on behalf of the creditor in Indiana, regardless of whether approval, acceptance, or ratification by any other agent or representative of the creditor or the person acting on behalf of the creditor in another state is necessary to give legal consequence to the consumer credit transaction. . . .

(5) Notwithstanding other provisions of this section:

> (a) except as provided in subsection (2), this article does not apply if the buyer, lessee, or debtor is not a resident of this state at the time of a credit transaction and the parties then agree that the law of the buyer's, lessee's, or debtor's residence applies; and
>
> (b) this article applies if the buyer, lessee, or debtor is a resident of this state at the time of a credit transaction and the parties then agree that the law of this state applies.

(6) Except as provided in subsection (5), the following agreements by a buyer, lessee, or debtor are invalid with respect to consumer credit sales, consumer leases, consumer loans, or modifications thereof, to which this article applies:

> (a) An agreement that the law of another state shall apply.
>
> (b) An agreement that the buyer, lessee, or debtor consents to the jurisdiction of another state.
>
> (c) An agreement that fixes venue. . . .

(8) If a creditor or a person acting on behalf of the creditor has violated the provisions of this article that apply to the authority to make consumer loans (IC 24-4.5-3-502), the loan is void and the debtor is not obligated to pay either the principal or loan finance charge, as set forth in IC 24-4.5-5-202.

76. Ind. Code § 24-4.5-5-202, "Effect of violations on rights of parties," provides:

. . . (3) A debtor is not obligated to pay a charge in excess of that allowed by this Article, and **if the debtor has paid an excess charge the debtor has a right to a refund**. A refund may be made by reducing the debtor's obligation by the amount of the excess charge. If the debtor has paid an amount in excess of the lawful obligation under the agreement, the debtor may recover the excess amount from the person who made the excess charge or from an assignee of that person's rights who undertakes direct collection of payments from or enforcement of rights against debtors arising from the debt.

(4) **If a debtor is entitled to a refund and a person liable to the debtor refuses to make a refund within a reasonable time after demand, the debtor may recover from that person a penalty in an amount determined by a court not exceeding the greater of either the amount of the credit service or loan finance charge or ten (10) times the amount of the excess charge. If the creditor has made an excess charge in deliberate violation of or in reckless disregard for this Article, the penalty may be recovered even though the creditor has refunded the excess charge.** No penalty pursuant to this subsection may be recovered if a court has ordered a similar penalty assessed against the same person in a civil action by the department (IC 24-4.5-6-113). With respect to excess charges arising from sales made pursuant to revolving charge accounts or from loans made pursuant to revolving loan accounts, no action pursuant to this subsection may be brought more than two (2) years after the time the excess charge was made. With respect to excess charges arising from other consumer credit sales or consumer loans, no action pursuant to this subsection may be brought more than one (1) year after the due date of the last scheduled payment of the agreement pursuant to which the charge was made. . . .

(7) If the creditor establishes by a preponderance of evidence that a violation is unintentional or the result of a bona fide error, no liability is imposed under subsections (1), (2), and (4) and the validity of the transaction is not affected.

(8) In any case in which it is found that a creditor has violated this Article, the court may award **reasonable attorney's fees** incurred by the debtor. . . . (Emphasis added)

77. Defendants are aware through prior litigation that their lending operations are illegal.

## SOVEREIGN IMMUNITY AS A DEFENSE TO STATE USURY LAWS

78. An entity must function as a legitimate "arm of the tribe" in order to fall under that tribe's sovereign immunity. *See Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1183 (10th Cir. 2010).

79. To determine if a particular entity is entitled to sovereign immunity, the majority of courts have adopted the framework laid out in *Breakthrough*, which analyzed "(1) [the entities'] method of creation; (2) their purpose; (3) their structure, ownership, and management, including the amount of control the tribe has over the entities; (4) whether the tribe intended for the entities to have tribal sovereign immunity; (5) the financial relationship between the tribe and the entities; and (6) whether the purposes of tribal sovereign immunity are served by granting immunity to the entities." *Breakthrough* at 1183, 1187-88.

80. An entity that "actually operates to enrich primarily persons outside the tribe or only a handful of tribal leaders" shows that it is not entitled to immunity. *People ex rel. Owen v. Miami*

*Nation Enterprises*, 2 Cal. 5th 222, 211 Cal. Rptr. 3d 837, 386 P.3d 357 (2016).

81. These so-called "tribal lenders" usually do not survive scrutiny when examined closely, since virtually all business functions occur far from tribal land, by nontribal members, and overwhelmingly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

82. Where non-tribal individuals and entities control and manage the substantive lending functions, provide the lending capital necessary to support the operation, and bear the economic risk associated with the operation, they are not in fact "operated" by Native American tribes and, therefore, are not shielded by sovereign immunity.

83. Further, sovereign immunity, even if legitimately invoked, still does not turn an otherwise illegal loan into a legal one. *See, e.g., United States v. Neff,* 787 F. App'x 81 (3d Cir. 2019) (upholding criminal convictions of two individuals engaged in an online payday lending rent-a-tribe scheme; sovereign immunity does not transform illegal loans into legal ones, and "reasonable people would know that collecting unlawful debt is unlawful").

84. Attempting to circumvent state interest rate caps by fraudulently hiding behind tribal sovereign immunity has been found to constitute criminal conduct. On October 13, 2017, a jury in the U.S. District Court for the Southern District of New York convicted Scott Tucker and Timothy Muir on 14 felony counts for their operation of a network of tribal lending companies. *See United States v. Tucker, et al.*, No. 1:16-cr-00091-PKC (S.D.N.Y). The conviction was affirmed in *United States v. Grote*, 961 F.3d 105 (2d Cir. 2020).

## COUNT I – INDIANA UNIFORM CONSUMER CREDIT CODE

85. Plaintiff incorporates paragraphs 1-84.

86. Because the loans made to Plaintiff violated the rate limits set by Indiana law and the violation was intentional, Plaintiff and the class members are entitled to ten (10) times the amount of the excess charge.

## CLASS ALLEGATIONS

87. Plaintiff brings this claim on behalf of a class, pursuant to Fed.R.Civ.P. 23(a) and (b)(3).

88. The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of "Minto Money" at more than 36% interest (all of its loans qualify) (c) where the last scheduled payment on the loan was on or after a date one year prior to the filing of this action.

89. Plaintiff may alter the class definition to conform to developments in the case and discovery.

90. The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 40 class members.

91. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are whether Defendants engage in a practice of making and attempting to collect illegal loans.

92. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

93. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

94. A class action is superior for the fair and efficient adjudication of this matter, in that:

    a. Individual actions are not economically feasible.

    b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i. Statutory damages;

      ii.     Attorney's fees, expenses and costs; and

      iii.    Such other or further relief as is appropriate.

## COUNT II – RICO

95.    Plaintiff incorporates paragraphs 1-84.

96.    This claim is against Isaacson, who is the RICO "person."

97.    All loans made in the name of "Minto Money" to Indiana residents are (a) unenforceable under Indiana law in whole or in part as to principal or interest because of the laws relating to usury, and (b) were incurred in connection with the business of lending money at a rate usurious under Indiana law, where (c) the usurious rate is at least twice the enforceable rate (36%).

98.    The loans are therefore "unlawful debts" as defined in 18 U.S.C. § 1961(6).

99.    "Minto Money" is an enterprise affecting interstate commerce, in that it is located outside of Indiana and makes loans to Indiana residents via the Internet.

100.    Defendant Isaacson is associated with this enterprise.

101.    Defendant Isaacson conducted or participated in the conduct of the affairs of "Minto Money" through a pattern of collection of unlawful debt, as set forth above, in violation of 18 U.S.C. § 1962(c).

102.    Plaintiff was deprived of money as a result.

## CLASS ALLEGATIONS

103.    Plaintiff brings this claim on behalf of a class.

104.    The class consists of (a) all individuals with Indiana addresses (b) to whom a loan was made in the name of "Minto Money" at more than 72% interest (all of its loans qualify) (c) where the loan was made on or after a date 4 years prior to the filing of suit and one or more payments were made on the loan.

105.    The class is so numerous that joinder of all members is not practicable. On information and belief, based on the making of loans over the Internet using form documents, there are at least 40 class members.

106. There are questions of law and fact common to the class members, which common questions predominate over any questions relating to individual class members. The predominant common questions are:

    a. Whether the loans at issue are "unlawful debts" as defined in RICO.

    b. Whether "Minto Money" is an "enterprise."

    c. Whether Defendant Isaacson is associated with "Minto Money."

    d. Whether Defendant Isaacson conducted or participated in the affairs of "Minto Money" through a pattern of making and collecting unlawful loans.

107. Plaintiff will fairly and adequately represent the class members. Plaintiff has retained counsel experienced in class actions and consumer credit litigation.

108. Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories.

109. A class action is superior for the fair and efficient adjudication of this matter, in that:

    a. Individual actions are not economically feasible.

    b. Members of the class are likely to be unaware of their rights.

WHEREFORE, the Court should enter judgment in favor of Plaintiff and the class and against Defendants for:

    i. Treble damages;

    ii. Attorney's fees, litigation expenses and costs of suit; and

    iii. Such other or further relief as the Court deems proper.

                              */s/Daniel A. Edelman*
                              Daniel A. Edelman

Daniel A. Edelman
Tara L. Goodwin
Heather Kolbus
Matthew J. Goldstein
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824

(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## JURY DEMAND

Plaintiff demands trial by jury.

*/s/ Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
Tara L. Goodwin
Heather Kolbus
Matthew J. Goldstein
**EDELMAN, COMBS, LATTURNER & GOODWIN, LLC**
20 South Clark Street, Suite 1500
Chicago, IL 60603-1824
(312) 739-4200
(312) 419-0379 (FAX)
Email address for service: courtecl@edcombs.com

## **NOTICE OF ASSIGNMENT**

Please be advised that all rights relating to attorney's fees have been assigned to counsel.

/s/ *Daniel A. Edelman*
Daniel A. Edelman

Daniel A. Edelman
**EDELMAN COMBS LATTURNER
& GOODWIN, LLC**
20 S. Clark St., Suite 1500
Chicago, IL 60603
(312) 739-4200
(312) 739-0379 (FAX)

## **DOCUMENT PRESERVATION DEMAND**

Plaintiffs hereby demand that each Defendant take affirmative steps to preserve all recordings, data, documents, and all other tangible things that relate to Plaintiffs, class members, the events described herein, any third party associated with any telephone call, campaign, account, sale or file associated with Plaintiffs, and any account or number or symbol relating to them. These materials are likely very relevant to the litigation of this claim. If any Defendant is aware of any third party that has possession, custody, or control of any such materials, Plaintiffs demand that Defendant request that such third party also take steps to preserve the materials. This demand shall not narrow the scope of any independent document preservation duties of the Defendant.

*/s/ Daniel A. Edelman*
Daniel A. Edelman